IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARY K. PALMER,<br><br>              Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security; and OFFICE OF GENERAL COUNSEL SOCIAL SECURITY ADMINISTRATION,<br><br>              Defendants. | **8:15CV255**<br><br>**MEMORANDUM AND ORDER** |

The plaintiff, Mary Palmer, appeals the denial of her application for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). Filing No. 1 (Complaint). The Commissioner of the Social Security Administration initially denied Palmer's application on January 15, 2013, and again upon reconsideration on March 27, 2013. On April 9, 2013, Palmer filed a Request of Hearing with an Administrative Law Judge ("ALJ"). On November 18, 2013, an ALJ heard Palmer's claim for disability insurance and issued an unfavorable decision on January 9, 2014 that denied her claim. Palmer then filed a request for the Appeals Council to review the ALJ's decision. The Appeals Council denied this request on June 2, 2015. Following the denial, Palmer filed a complaint before this Court.

    **I.**    **BACKGROUND**

Palmer, born in January 1968, successfully completed high school and two years of college with no specialized job training, trade, or vocational school. Filing No. 8-6 at 2,14 (Work History Report). Palmer worked as an Assistant Branch Manager for the Douglas County Treasurer Office from May 1994 to September 2012, typically clocking in eight hours per day, five days per week. *Id* at 5-6*.* When asked to describe the duties she performed as Assistant Branch Manager, Palmer answered: "A lot of walking and standing to monitor employees and to assist customers. . . . lifting boxes of license plates and office supplies. Computer work as well to run reports. . . [and] check e-mails. . ." *Id.* at 15.

The Douglas County Civil Service Commission describes the primary duties of an Assistant Branch Manager as, "Assist[ing] in directing and overseeing the work of staff in the daily operation of a Branch Office" and "Respond[ing] to questions from the public and staff regarding applicable State statutes and Douglas County/departmental procedures. . . ." Filing No. 8-7 at 34 (Position Description). Basic skills and abilities required include the ability to tolerate considerable standing and walking in the performance of duties, the ability to safely lift and move objects which may weigh up to 35 pounds, and occasional climbing, bending, squatting, stooping, kneeling, and crouching. *Id.* at 35. Although she is no longer working, Palmer is still able to run errands, cook dinner, and perform minor household chores that do not require heavy lifting or bending. Filing No. 8-6 at 24 (Daily Activities and Symptoms Report).

Palmer complains of a stabbing pain in her neck and shoulders, congestion, lack of sleep, and limited mobility in her neck. *Id.* at 26. A look at her medical history reveals chronic rhinosinusitis, obesity, hypertension, hypercholesterolemia, stress incontinence, irritable bowel syndrome, and GERD (gastroesophageal reflux disease). Filing No. 8-11 at 4 (Non-Examining Orthopedic Doctor Report). There is also documentation of problems with chronic headaches, myofascial pain, depression, insomnia, osteoarthritis, allergies, and asthma throughout Palmer's past medical care under her primary physician, Dr. Donald Rigler, D.O. Filing No. 8-8 at 39, 47, 63 (Progress Notes from Dr. Rigler). As of October 1, 2012, Dr. Rigler acted as Palmer's primary physician for twenty years. Filing No. 8-10 at 52 (Long Term Disability Claim Physician's Statement). An MRI on December 23, 2010 revealed degenerative joint disease of her neck and back. Filing No. 8-8 at 101 (Radiology Imaging Services Report). Another MRI on May 2, 2013 revealed degenerative joint disease of her hips. Filing No. 8-13 at 57 (Radiology Imaging Services Report). Palmer states that her daily physical activity is limited because of constant neck pain and headaches. Filing No. 8-6 at 33 (Disability Report Appeal).

On May 7, 2009, at the direction of Dr. Rigler, Palmer underwent an MRI on her left shoulder after experiencing chronic lateral shoulder pain. Filing No. 8-10 at 44 (MRI Shoulder Results

2

Report).  The interpreting physician noted that probable calcification of the supraspinatus tendon near its insertion was likely to suggest calcific tendonitis in Palmer's left shoulder. *Id.* at 45. Dr. Rigler referred Palmer to Dr. M. Andrew Thompson, M.D., who treated her left shoulder with an injection on June 24, 2009.  Filing No. 8-10 at 41 (Progress Note).  Dr. Thompson also recommended physical therapy to improve the range of motion and strength of her left shoulder. *Id.* The treatment made Palmer's pain "much improved." *Id.*

On December 17, 2010, Palmer complained to Dr. Rigler of pain on the right side of her neck that worsened whenever she would turn her head to the right. Filing No. 8-8 at 91 (Office Visit). She did not complain of any radiation of the neck pain into her right arm and denied any significant numbness, tingling, or weakness of the right arm. *Id.* Six days later, on December 23, 2010, Dr. Rigler ordered Palmer to undergo an MRI because of pain and numbness in her right shoulder, along with neck pain. *Id.* at 99.  The interpreting physician discovered mild accentuation of the thoracic kyphosis, mild multilevel degenerative changes in the cervical spine, and a tiny disk protrusion at C4-C5. *Id.* at 98-99.  When Dr. Rigler spoke to Palmer about the results of the MRI on December 30, 2010, she reported still having "a lot" of posterior neck pain radiating into her right arm. *Id.* at 101.

Because of the pain in her right arm, Dr. Rigler referred Palmer to Dr. Patricia Chudomelka, M.D., PhD., for a cervical epidural nerve block. *Id.* On January 1, 2011, at age 42, Palmer received a cervical epidural steroid injection and a right sided occipital trigger point injection. *Id.* at 3.  On a June 12, 2012 visit to Dr. Rigler, Palmer complained of continuing pain radiating from her neck into her right arm with intermittent numbness and tingling. *Id.* at 56.  On March 3, 2013, Dr. Rigler again sent Palmer to Dr. Thompson, who gave her an injection in her right shoulder. Filing No. 8-10 at 17,19 (Patient Visit Note).  Dr. Thompson opined that her pain symptoms were "likely related to AC joint arthritis." *Id.* at 18.  On September 25, 2013, at age 45, Palmer underwent arthroscopic right shoulder surgery.  Filing No. 8-13 at 10 (Hospital Chart Notes).  After surgery, Dr. Thompson diagnosed her with impingement syndrome and osteoarthritis of the acromioclavicular (AC) joint. *Id.*

3

On February 9, 2011, at age 43, Palmer sprained her left shoulder during a slip in the shower. Filing No. 8-8 at 88-89. Palmer elected to have surgery on her left shoulder on May 12, 2011, performed again by Dr. Thompson. Filing No. 8-10 at 37. Afterwards, Dr. Thompson diagnosed Palmer with impingement syndrome and rotator cuff calcific tendonitis of the left shoulder. *Id.* He prescribed Norco and physical therapy to help Palmer recover from the surgery. *Id.* at 35. Seven months post-surgery, Palmer told Dr. Rigler of increasing pain and stiffness in her left shoulder and directly above her left collarbone. Filing No. 8-8 at 75. She stated that it was sometimes painful to lay on her left side because of the shoulder pain and that her range of motion in her left shoulder had decreased. *Id.* On December 13, 2011 she received an injection in her left shoulder by Dr. Thompson to treat the pain. Filing No. 8-10 at 20 (Progress Note).

Dr. Rigler eventually referred Palmer to Dr. Criscuolo, M.D., a pain management specialist, for her chronic neck and back pain. Filing No. 8-8 at 126 (Office Visit). On a July 18, 2012 visit, after detailing her neck and back pain, Dr. Criscuolo instructed Palmer to follow a core muscle strengthening program and provided a back exercise program for her to follow. *Id.* at 128. He also prescribed Mobic for her neck and back pain, in addition to the Flexeril and hydrocodone already prescribed to Palmer. *Id.* On August 15, 2012 Dr. Criscuolo prescribed Lidoderm patches to help ease Palmer's neck and lower back pain. *Id.* at 124.

On August 29, 2012, at age 44, Palmer underwent her first acupuncture treatment for her neck and lower back pain. *Id.* at 120. She next received acupuncture on September 11, 2012. *Id.* at 117. Dr. Criscuolo noted less spasming throughout her spine, and Palmer also noted some relief from the procedure. *Id.* at 118. In 2012, Palmer would again receive acupuncture on October 4, November 1, and December 4. *Id.* at 114, 111, 148. Her last treatment on record is January 14, 2013. *Id.* at 145. Palmer reported "some relief" from her neck and back pain after each session. *Id.* at 112, 115, 118, 146, 148.

On October 1, 2012, Palmer sought counseling from Dr. Rigler regarding her ability to work. *Id.* at 39. She requested part time hours at work, but was told such hours were unavailable. *Id.* She

4

reported having difficulty with daily headaches, pain radiating from her right posterior neck into her right arm, upper back pain, and intermittent lower back pain. *Id.* Palmer stated she could not sit, stand, or walk for more than an hour. *Id.* That same day, Dr. Rigler opined that Palmer's incapacity to sit or stand for longer than one hour or lift more than five pounds would render her unable to work. Filing No. 8-10 at 50 (Long Term Disability Claim Physician's Statement). He also stated that her inability to perform repetitive work above shoulder level height would render her unable to work. *Id.* He expected Palmer's degenerative joint disease of the neck and back to worsen, and "never" expected Palmer to return to her prior level of functioning. *Id.* Dr. Rigler opined that the probable duration of her condition was "indefinite." *Id.* at 52.

During a January 7, 2013 appointment with Dr. Rigler, Palmer reported that after quitting her job a few months prior, her stress level had improved. Filing No. 8-8 at 134 (Office Visit). Palmer's self-reported last day of work was September 10, 2012. Filing No. 8-6 at 13 (Disability Report). However, since quitting her job, she had not been going to acupuncture or massage therapy as frequently as before. Filing No. 8-8 at 134 (Office Visit). On May 2, 2013, at age 44, an MRI of Palmer's left hip revealed moderate degenerative joint disease. Filing No. 8-13 at 54. On July 26, 2013, Palmer reported experiencing anxious and fearful thoughts, depressed mood, and sleep disturbance. *Id.* at 48. She cited increased stress as her father was very ill with terminal esophageal cancer at the time. *Id.* At this time she denied experiencing any panic attacks. *Id.* As of September 16, 2013, medical records indicate Palmer was on sixteen different active medications for her various health issues. *Id.* at 43-44. Her prescriptions included Ambien, Vicodin, Flexeril, Propranolol, Lidoderm, and Mobic. *Id.*

## II.     LEGAL STANDARD

In an appeal of the denial of Social Security disability benefits, this court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole'" and "'may not reverse . . . merely because substantial evidence would support a contrary outcome.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011) (quoting

*Dolph v. Barnhart*, 308 F.3d 876, 877 (8th Cir. 2002) (alteration in original). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir.2010)).

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). The court may not reverse a decision supported by substantial evidence, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (citation omitted). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner's] action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (alteration in original) (citations omitted) (internal quotation marks omitted). In determining whether substantial evidence in the record supports the decision, the court must consider evidence that both detracts from and bolsters the Commissioner's decision. *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2000) (citations omitted).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000) (citations omitted). The court does not owe deference to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner must perform a five-step sequential analysis described in the Social Security Regulations. 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the Commissioner must determine: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3)

6

whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 678 n 9 (8th Cir. 2009). "Through step four of this analysis, the claimant has the burden of showing that she is disabled. Only after the analysis reaches step five does the burden shift to the Commissioner to show that there are other jobs in the economy that a claimant can perform." *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008) (citations omitted). If the ALJ finds that a claimant is disabled or not disabled at a step, the evaluation does not go on to the next step. 20 C.F.R. § 404.1520(a)(4).

In order to evaluate the claimant's impairments at steps four and five of the analysis, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC represents what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("Social Security proceedings are inquisitorial rather than adversarial."). A claimant's RFC is a medical question; therefore,

> [s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace. In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional.

*Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citations omitted) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Treating Physician

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F. 3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

7

evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000)(quoting 20 C.F.R. § 404.1527(d)(2) (2006)). The treating doctor's opinion is given this weight because of their "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). An ALJ cannot substitute his opinion for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

The Court finds, in part, the ALJ denied Palmer's claim after giving greater weight to a non-examining physician's opinion than the opinion of Palmer's primary physician. Filing No. 8-2 at 47 (ALJ Hearing Decision). The ALJ himself noted that a "medical source statement from [a] treating physician is often given great or controlling weight." *Id.* However, in the very next sentence, the ALJ wrote that he was "unable to give [Dr. Rigler's medical opinion] more than minimal weight" because Dr. Rigler's opinions were "not supported by objective findings arising from doctors [sic] examination and treatment of the patient." *Id.*

Dr. Rigler acted as Palmer's primary physician for twenty years. Filing No. 8-10 at 52 (Long Term Disability Claim Physician's Statement). From May 2009 to January 2013, there are at least fifteen different office visits on record by Palmer to Dr. Rigler's office for various health concerns. Filing No. 8-8 at 39, 43, 47, 51, 56, 63, 70, 75, 78, 83, 86, 88, 91, 134 (Office Visits); Filing No. 8-13 at 53 (Office Visit). Dr. Rigler referred Palmer to every other doctor in the medical record – Dr. Chudomelka, Dr. Thompson, and Dr. Criscuolo. Filing No. 8-8 at 101, 126 (Office Visit); Filing No. 8-10 at 41 (Progress Note); Filing No. 8-8 at 126 (Office Visit). He also ordered every one of Palmer's MRIs on record and diagnosed her various ailments over the years. Filing No. 8-10 at 44 (MRI

8

Shoulder Results Report); Filing No. 8-8 at 99 (Radiology Imaging Services Report); Filing No. 8-13 at 57 (Radiology Imaging Services Report).

Dr. Victoria Langa, M.D., the consulting doctor for the Social Security Administration, completed a Long Term Disability Report after examining Palmer's medical records, but not Palmer herself. Filing No. 8-11 at 3 (Medical Record Review). Dr. Langa did not speak to Dr. Rigler, as no telephone consultation was requested. *Id.* at 8. Dr. Langa opined in her medical analysis that, after considering the findings on physical examinations and diagnostic studies by Palmer's doctors, Palmer should "at the very least . . . be capable of performing work in the sedentary/light categories." *Id.* at 8-9. This is in direct contrast with Dr. Rigler, who, after acting as Palmer's primary physician for twenty years, opined that Palmer's various health conditions would cause episodic flare-ups periodically preventing Palmer from performing her job functions. Filing No. 8-10 at 53 (Family and Medical Leave Act Application). His prognosis for her recovery was "guarded," as he opined that Palmer was unable to sit or stand for more than one hour, unable to lift more than five pounds, and not allowed to engage in any repetitive work above shoulder height level. *Id.* at 50. Dr. Rigler believed that Palmer had achieved her maximum medical improvement and would "never" return to her prior level of functioning before she became disabled. *Id.*

The court finds that Dr. Rigler's medical opinion is supported by substantial evidence on the record, and therefore should have been given controlling weight in the ALJ's decision. Dr. Rigler offered consistent opinions as to Palmer's chronic neck pain, back pain, and rhinosinusitis. Filing No. 8-8 at 41, 45, 47, 51, 56, 63, 70, 75, 78, 83, 86 (Office Visits). Dr. Rigler even referred Palmer to a pain management specialist because of her chronic neck and back pain. Filing No. 8-8 at 126 (Office Visit); Filing No. 8-10 at 52 (Family and Medical Leave Act Application). Because of his unique perspective as Palmer's treating physician for twenty years and his consistent medical opinions, Dr. Rigler's records should have received proper consideration as evidence supporting the severity of Palmer's disability.

Accordingly, the Court finds there is not substantial evidence on the record to support the ALJ's determination in this regard.

### B. Plaintiff's Testimony

*1. Law*

The ALJ must evaluate subjective complaints based on the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). The 8th Circuit stated:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Id.* (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000). "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). However, the ALJ may not discredit the claimant's subjective complaints on this basis without first considering explanations offered or other information in the record. SSR 96-7P at 7.

"An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (citations omitted). A claimant may have disabling pain and still be able to perform some daily home activities. *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work" (internal quotation marks omitted) (citations omitted)). The consistency of the

claimant's various statements and the consistency between statements and other evidence provides a "strong indication" of the credibility of the claimant's subjective claims. SSR 96-7P.

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103,111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial"). An ALJ also has a duty to fully develop the administrative record. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). The duty to develop the record extends to cases where the claimant is represented by counsel. *Snead v. Barnhart*, 360 F.3d 834 at 838 (8th Cir. 2004). The ALJ's duty to develop the record in a social security hearing may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).

*2. Subjective Allegations of Pain*

In denying disability benefits, the ALJ attempted to discredit Palmer's subjective complaints of chronic neck pain. Although the ALJ found that Palmer's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he believed her statements concerning the intensity, persistence, and limiting effects of the alleged symptoms were not consistent with objective evidence. Filing No. 8-2 at 46, 48 (ALJ Hearing Decision). The Court finds that substantial evidence on the record does not support the ALJ's finding that Palmer's subjective complaints of pain were inconsistent with objective evidence.

While noting that Palmer has mild degenerative disc disease in her cervical spine, the ALJ wrote that past examinations did not "consistently show[ ] her having . . . significant muscle spasms or limitations of motion" in her cervical spine. *Id.* at 47. While this may be true for a few examinations, there is substantial evidence in the medical record to show that Palmer has struggled with chronic neck pain beginning as early as 2010. The medical record indicates that Palmer first complained of neck pain to Dr. Rigler on December 17, 2010. Filing No. 8-8 at 91 (Office Visit). An MRI on December 23, 2010 revealed a mild accentuation of the thoracic kyphosis, mild multilevel

changes in the cervical spine, and a tiny disk protrusion at C4-C5. *Id.* at 98-99. A week later, after telling Dr. Rigler she was still having "a lot" of posterior neck pain radiating into her arm, Dr. Rigler recommended Palmer undergo a cervical epidural nerve block. *Id.* at 101. On January 1, 2011, Palmer received a cervical epidural steroid injection; over a year later, on June 12, 2012, she again complained to Dr. Rigler of neck pain radiating into her right arm. *Id.* at 3, 56. In July 2012 Palmer begin seeing Dr. Criscuolo, a pain management specialist, to treat her chronic neck and back pain. Filing No. 8-8 at 126 (Office Visit). In August 2012 Palmer would receive her first acupuncture treatment, with her last treatment on record in January 2013. *Id.* at 120, 145. As a whole, the record shows that Palmer's subjective complaints of neck pain are consistent and thus may not be discounted by the ALJ.

The ALJ also relied on the medical record review by Dr. Langa, a non-examining physician, to support his findings. Filing No. 8-2 at 47-48 (ALJ Hearing Decision). Notwithstanding the fact that the ALJ relied too heavily upon Dr. Langa's review, as discussed above, the ALJ failed to fully incorporate Dr. Langa's findings into his decision. While the ALJ wrote that Dr. Langa found Palmer should "avoid repetitive neck motions," he omitted the finding that Palmer should not "be required to hold her head in a stationary position for any prolonged period of time." *Id.* at 47; Filing No. 8-11 at 9 (Medical Record Review). The ALJ did not justify why Dr. Langa's opinion that Palmer should avoid repetitive neck motions supported his findings while the opinion that Palmer should not hold her head in a stationary period for a lengthy time did not; he just simply said Dr. Langa's statement was "consistent with record evidence and supports [his] findings in this case." Filing No. 8-2 at 48 (ALJ Hearing Decision). This failure to give full consideration to all of the evidence presented relating to Palmer's subjective complaints does not justify the ALJ's dismissal of Palmer's subjective pain complaints.[1]

---

[1] Defendant also cites the conservative treatment of Palmer's symptoms while adequately controlling pain with medication as substantial objective evidence that supports the ALJ's finding. Filing No. 16 at 23 (Defendant's Brief). In particular, defendant points out three office visits with Dr. Rigler in which Palmer's pain was reportedly well controlled with medication: December 12, 2011; February 24, 2012; and August 15, 2012. *Id.* Palmer herself admits that taking medication, receiving acupuncture and massages, and applying heat and pain patches does help relieve her pain. Filing No. 8-6 at 26 (Daily Activities and Symptoms Report). However, when asked to describe the intensity level of her symptoms

12

Accordingly, the Court finds there is not substantial evidence on the record to support the ALJ's determination in this regard.

### 3. Credibility

As laid out by Palmer's attorney in the opening statement at the ALJ hearing, Palmer's neck pain was central to her disability claim. Filing No. 8-2 at 63 (Transcript of Oral Hearing). When the ALJ asked Palmer about the main symptoms that kept her from working, she answered that her chronic neck pain radiated down into her shoulders and made her unable to work. *Id.* at 74. She further answered that she suffered from this pain on a daily basis. *Id.* When asked to rate her pain on a scale of one to ten during the course of an average day, with ten being the worst pain, Palmer stated her pain was "never below a five" and normally at "about a six or a seven." *Id.* at 75. Palmer related that while a "majority" of the pain medications she takes for her pain are prescription, she "sometimes" takes Advil. *Id.* at 76. When asked, Palmer confirmed she takes her medication on a regular basis, getting "about two hours of relief" after taking pills every four hours, as instructed. *Id.* As of September 16, 2013, eight months after filing her application for disability insurance benefits, Palmer was on four different pain medications – Vicodin, Flexeril, Lidoderm patches, and Mobic.[2] Filing No. 8-13 at 43 (Office Visit). She further testified that in spite of taking these different medications, they failed to take all of the pain away and only "take[ ] the edge off, basically." Filing No. 8-2 at 77 (Transcript of Oral Hearing).

When examined by her own attorney, Palmer stated that it hurt to turn her head both to the left and the right, but more so to the right. *Id.* at 96. She noted that putting her head down, whether

---

on a good day versus a bad day, Palmer answered that she "do[es] not experience good days." *Id.* When asked what medications she takes for her symptoms, she said that Flexeril and Meloxicam work "somewhat" well, and Vicodin and Lidocaine pain patches work "allright [sic]." *Id.* at 27. She has also tried different treatments for her pain, such as physical therapy, acupuncture, nerve blocks, and deep tissue massages. *Id.* This is corroborated by evidence in the medical record. Three out of fifteen appointments on the record with Dr. Rigler in which Palmer reported medication was controlling her pain does not seem consistent. When taken as a whole, the record shows that Palmer's subjective pain complaints are consistent and may not be discounted by the ALJ.

[2] The dosages and directions are as follows: Vicodin, 7.5 Mg – 750 Mg, take 1 tablet by oral route every 4 – 6 hours as needed for pain, not to exceed 5 tablets in 24hrs; Flexeril, 10 Mg, take 1 tablet (10 Mg) by oral route 3 times every day as needed for low back pain; Lidoderm, 5% (700 Mg/patch), apply 1 patch by transdermal route every day (May wear up to 16 hours); Mobic, 7.5 Mg, take 1 tablet (7.5 Mg) by oral route every day.

reading or checking e-mails on the computer, put more stress on her neck. *Id.* In order to make her neck feel better, depending on the severity of the pain, she would either do neck stretches, use heat or ice, or take pain medication. *Id.* at 97. When Palmer's attorney asked her to answer how often she missed work due to her neck pain versus her sinus issues, the ALJ interrupted and said, "That's okay, counsel. . . . I get the general idea of where you're going with that. And I find your claimant to be credible. So I don't know that you need to add anymore to that." *Id.* at 100. Because of this interruption, Palmer did not provide any further testimony about her neck pain and the limitations caused by it.

Although the ALJ found Palmer to be credible at the hearing, he inconsistently found Palmer not to be fully credible in his written decision. Filing No. 8-2 at 48 (ALJ Hearing Decision). The ALJ wrote that Palmer's subjective testimony of "[an inability] to work due to chronic severe headaches; severe neck pain; severe right shoulder pain (dominant hand); pain and/or numbness in her right hand; severe sinus infections every month; lower back pain; bilateral hip pain; fatigue; severe panic attacks and depression" was inconsistent with the objective medical evidence on record. *Id.* He failed to mention Palmer's testimony regarding her excessive need to lie down and prior absenteeism from work, which the ALJ seemingly found credible at the hearing.

The plaintiff asserts that because of the non-adversarial nature of the hearing, plaintiff's attorney reasonably relied upon the ALJ's finding on the record that he found credible plaintiff's testimony regarding her excessive need to lie down and prior absenteeism from work. At the beginning of the hearing, Palmer's attorney told the ALJ of "an opinion that [Palmer] cannot be required to hold her head in a stationary position for any prolonged period of time. And [Palmer] can kind of flush out some more details on that." Filing No. 8-2 at 67-68 (Transcript of Oral Hearing). However, Palmer was not given the chance to expound upon her neck pain, as the ALJ interrupted her testimony to say he found her credible. Palmer's attorney reasonably relied upon the ALJ's finding on the record the ALJ found Palmer credible, and cut her testimony short. Had Palmer testified further on the extent of her neck pain, it could have reasonably helped develop her

argument for granting benefits. By interrupting Palmer's testimony to say that he found Palmer to be credible, the ALJ did not give Palmer a chance to further develop the record on her neck pain, which was a crucial issue. Thus, the ALJ did not perform his duty to develop the record, as his interruption of Palmer's testimony caused a crucial issue to remain underdeveloped.

Accordingly, the Court finds there is not substantial evidence on the record to support the ALJ's determination in this regard.

### C.  Vocational Expert Testimony

To assist an ALJ in making a disability determination, a vocational expert ("VE") is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. A hypothetical question is properly formulated if it sets forth impairments "supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). A VE's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (citing *Porch v. Chater*, 115 F.3d 567, 572-73 (8th Cir. 1997) and *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996)). Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions. For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

The ALJ asked the VE two hypothetical questions:

[1.] [A]ssume somebody of the same age, which is a younger individual; education, which is high school or greater; and the same work experience as the claimant. And further assume that they retain the capacity to perform a full-range of light work as it is addressed in the grid rules with the Social Security Regulations. Would that individual be capable of performing their past relevant work as you've described it here?

[2.] Assume the same individual as described in the first hypothetical. But further assume that the individual's unable to sit, stand, and, or walk for more than one hour in total during an eight-hour work day; is limited to lifting and carrying no more than five pounds on an occasional basis during an eight-hour work day, which is up to one-third of the day. Further assume that the individual has significant postural limitations, meaning up to one-half to two-thirds of the day, they're unable to perform activities involving bending; or stooping; or kneeling; crouching; or crawling. Further

assume the individuals [sic] unable to engage in repetitive overhead working from the shoulder level up with either upper extremity. Further assume that the individual is going to have absences of four days or more per month due to exacerbations of their impairments. And, mentally, assume the individual's limited to performing that the mental demands of simple, routine, repetitive tasks. Would such an individual be able to perform their past relevant work, as you've testified to here today?

Filing No. 8-2 at 107-08 (Transcript of Oral Hearing). In response to the first question, the VE answered that the particular individual described would be capable of performing past relevant work as an office manager "as long as the employer was willing to accommodate for the individual's lack of lifting [a fifty pound box of] license plates." *Id.* at 107. The VE also answered that the individual could work as a real estate clerk. *Id.* In response to the second question, the VE answered that the particular individual described would not be able to perform their past relevant work. *Id.* at 108. The VE also answered that there was no other work "existing in significant numbers in the regional or national economy" that the individual would be capable of performing. *Id.* In finding that Palmer could perform her past work as an office manager, the ALJ wrote that she could:

> . . . lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for about six hours in an eight hour workday. She can push and/or pull without limited [sic], other than shown for lifting and/or carrying. She is able to climb ladders and stairs, balance, stoop, kneel, and crouch frequently and is able to climb ladders, ropes, or scaffolds, and/or crawl on occasional basis. She is unable to be exposed to concentrated exposure to vibrations and hazards.

*Id.* at 49. In justifying his findings, the ALJ relied upon the VE's testimony with regard to the first hypothetical question. *Id.*

The first hypothetical question posed to the VE was inaccurate because it did not include Palmer's limitations as diagnosed by her primary physician, whose opinion was improperly considered by the ALJ; nor did it include the limitations stated by Palmer in her own testimony. Under *Taylor*, the VE's testimony cannot be considered substantial evidence unless the ALJ included all of Palmer's deficiencies in the hypothetical question. 118 F.3d at 1278. The first question did not include Dr. Rigler's opinion that Palmer could not sit or stand for longer than an hour, crawl, climb, lift more than five pounds, or engage in repetitive work above shoulder height level. Filing No. 8-10 at 50 (Long Term Disability Claim Physician's Statement). The first question also did not include Palmer's testimony that she suffers from fatigue on a daily basis, causing her to lie down on average "at least six plus hours a day". Filing No. 8-2 at 86-88, 93 (Transcript of Oral Hearing). Nor did it include Palmer's testimony that she takes, on average, four naps a

16

day for six to seven total hours. *Id.* at 94. It also did not include Palmer's limitations in her neck, due to the failure of the ALJ to fully develop the record. Because the first hypothetical question did not include all of Palmer's deficiencies, and the ALJ relied on this question in finding that Palmer could perform her past work as an office manager, the VE's testimony cannot be considered substantial evidence.[3]

### D. Residual Functional Capacity

Residual functional capacity ("RFC") is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184 (July 2, 1996). RFC is what an individual can still do despite his impairments and the resulting limitations. *Id.* While RFC is a medical question, RFC is not based solely on "medical" evidence. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (holding that the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of the limitations). "[A]n ALJ has an obligation to 'fully investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work.'" *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting *Nimick v. Secretary of Health and Human Servs.*, 887 F.2d 864, 866 (8th Cir. 1989)). "A conclusory determination that a claimant can perform past work without these findings. . . does not constitute substantial evidence that the claimant is able to return to his past work." *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997) (quoting *Groeper*, 932 F.2d at 1239). If an ALJ fails to make the necessary findings, reversal is required unless the claimant suffered no prejudice, for example, a reversal is unnecessary if the record contains substantial evidence that the claimant can perform past work. *See, e.g., Battles v. Sullivan*, 902 F.2d 657, 659-660 (8th Cir. 1990).

---

[3] It is also worth noting that even Dr. Langa opined that Palmer "should not be required to perform repetitive neck motions or be required to hold her head in a stationary position for any prolonged period of time." Filing No. 8-11 at 9. Even though the ALJ erroneously relied upon Dr. Langa's opinion in his findings, this portion of Dr. Langa's opinion was nowhere to be found in his decision.

17

While the ALJ did find that Palmer had severe impairments including but not limited to chronic right shoulder pain, moderate degenerative joint disease of the left hip, and mild degenerative cervical disc disease, he nonetheless found that she still had the RFC to perform her past relevant work as an office manager. Filing No. 8-2 at 49 (ALJ Hearing Decision). According to Palmer, her former position as Assistant Branch Manager for the Douglas County Treasurer Office involved a "lot of walking and standing to monitor employees and assist customers at the counter. Also, lifting boxes of license plates and office supplies. Computer work as well to run reports, type correspondance [sic], check e-mails, and type titles and registrations." Filing No. 8-6 at 6 (Work History Report). She reported the heaviest weight she lifted was fifty pounds, and that she frequently lifted less than ten pounds from 1/3 to 2/3 of the work day. *Id.* Palmer reported working eight hours a day, five days a week, from May 1994 to September 2012. *Id.*

The Douglas County Civil Service Commission described the primary function of the Assistant Branch Manager as to assist in "coordinating and directing the duties of the employees in the Branch Office of the Douglas County Treasurer." Filing No. 8-7 at 34 (Position Description). Basic skills and abilities required include the ability to "tolerate considerable standing and walking in the performance of duties" and "sufficient dexterity to occasionally climb, reach, balance, bend, stoop, squat, kneel, crouch, crawl, push, pull, or lift." *Id.* at 35. Potential employees must also be able to "safely lift and move objects which may weigh up to 35 pounds." *Id.* Palmer's own former supervisor noted that the job could not be performed by alternating standing and sitting. *Id.* at 38 (Long Term Disability Claim Job Analysis). Her former supervisor also indicated the job could not be modified to accommodate Palmer's disability either temporarily or permanently, and it would not be possible to offer the employee assistance in doing the job. *Id.*

According to Palmer, she is able to run errands and perform minor household chores that do not require heavy lifting or bending. Filing No. 8-6 at 24 (Daily Activities and Symptoms Report). She may sometimes cook, usually preparing quick and convenient meals like Hamburger Helper or "something in a crock pot" – nothing that entails a lot of time and effort. Filing No. 8-2 at 73 (Transcript of Oral Hearing). She relies on her husband for a lot of daily activities. *Id.* This includes cooking, cleaning, doing laundry, and yard work. *Id.* Palmer accompanies her husband on weekly shopping trips to the grocery store,

18

walking for up to an hour. *Id.* at 77. Her husband takes the items off of the shelf, puts them in the cart, unloads the cart, and carries the bags. *Id.* at 84. Palmer pushes the cart to help relieve pain in her hips. *Id.* She stated that after returning home from a shopping trip, she will feel "pretty wiped out" and "pretty tired" while also experiencing pain in her hips. *Id.* at 97. Palmer states that her pain medication makes her dizzy and drowsy while also affecting her ability to concentrate and focus. *Id.* at 86, 91. She takes an average of four naps per day, with each nap ranging from thirty minutes to three hours. *Id.* at 87-88. Neck pain and drowsiness limit Palmer's ability to read or use her computer to no more than thirty minutes. *Id.* at 96.

In determining Palmer's RFC, it appears that the ALJ did not fully investigate the physical and mental demands of Palmer's past relevant work. Palmer's primary physician of twenty years opined that she cannot sit or stand for longer than an hour, but alternating between standing and sitting is not possible at Palmer's former job. The ALJ found that she can frequently lift or carry ten pounds, but Dr. Rigler opined she cannot lift more than five pounds. Dr. Rigler also found Palmer unable to crawl or climb, which the office manager job description states she must occasionally be able to occasionally do. Palmer's medication makes her dizzy and drowsy, and she must lie down for at least six hours a day. This is incompatible with a typical forty-hour workweek, especially in a job that cannot be modified temporarily or permanently to accommodate Palmer's disability. Based on all of the relevant evidence, including medical records, observations of treating physicians and others, and the individual's own description of the limitations, the Court finds that the ALJ did not correctly determine Palmer's RFC.

Further, as discussed above, the Court finds that the ALJ erred in giving greater weight to a non-examining physician's opinion than the opinion of Palmer's primary physician of twenty years; the ALJ erred in discounting her subjective allegations of pain; the ALJ erred in making inconsistent credibility findings as to Palmer's testimony and failing to fully develop the record. Because of these reasons, the Court finds that the ALJ did not correctly determine Palmer's RFC based on all of the relevant evidence.

For all of the reasons found above, this court finds that the determination of the ALJ to deny benefits is not supported by substantial evidence. "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is

appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992). The Court finds plaintiff has met this burden.

THEREFORE, IT IS ORDERED that:

1. The decision of the Commissioner is reversed.

2. Palmer's appeal is granted.

3. This action is remanded to the Commissioner with instructions to award benefits.

4. A separate Judgment will be issued in conjunction with this Memorandum and Order.

5. Any motion for attorney fees shall be filed within 14 days of the date of this order; any objection thereto shall be filed within 14 days thereafter.

Dated this 25th day of July, 2016.

BY THE COURT:

s/ Joseph F. Bataillon  
Senior United States District Judge